Richard Johnston – SBN 124524
Johnston Law Office
131A Stony Circle, Suite 500
Santa Rosa, California 95401
Telephone (707) 939-5299
Facsimile (707) 837-9532
Richard.Johnston@Johnston-Law-Office.com

*Attorney for Plaintiff*
*Jeffrey D. Mauerman*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY D. MAUERMAN,<br><br>Plaintiff,<br><br>vs.<br><br>SUN LIFE ASSURANCE COMPANY OF CANADA,<br><br>Defendant. | Case no.<br><br>COMPLAINT |

Plaintiff Jeffrey D. Mauerman alleges:

## Jurisdiction and Venue

1. This action arises under the Employee Retirement Income Security Act of 1974, 29 USC § 1001 et seq. (ERISA) and more particularly 29 USC §§ 1132(a)(1)(B), 1132(a)(2), and 1132(g). This court has jurisdiction in this matter under 29 USC § 1132(e) and 28 USC § 1367(a). At relevant times, Mr. Mauerman resided in Santa Rosa, California; the named defendant, Sun Life Assurance Company of Canada, could be found in this district; and certain of Sun Life's obligations, which obligations Sun Life failed and refused to perform as herein alleged, were due within this district.

## Factual Background

2. Mr. Mauerman, at relevant times, was an employee of Anritsu Company. As a function of this employment, Mr. Mauerman was and is a qualified participant in and beneficiary of an Anritsu employee benefit plan as defined by 29 USC § 1002(3) ("the Plan"). The Plan promised, among other

things, life insurance and long-term disability (LTD) benefits to eligible employees, including Mr. Mauerman; these benefits were provided through a group insurance policy ("the Policy") issued by Sun Life. Sun Life, in addition to issuing the Policy and funding benefits for participants and beneficiaries thereunder, also acted as adjudicator of claims submitted under the Policy, and was a Plan fiduciary as defined by 29 USC § 1002(21)(A).

3. Prior to the illness that caused his disability, Mr. Mauerman was a notably successful Project Manager at Anritsu. In 2000, he developed a cancer of the tongue, and underwent significant radiation therapy and chemotherapy. The aftermath of this disease and its treatment regimen caused profound functional restrictions, including among other things significant dyspnea (difficult or labored breathing); dysphonia (difficulty in speaking due to a physical disorder of the mouth, tongue, throat, or vocal cords); feeding-tube-dependent oropharyngeal dysphagia (difficulty swallowing); multiple aspiration pneumonias (lung infection that develops after inhaling food or liquid into the lungs); hypotension (chronic low blood pressure); orthostasis (dizziness or lightheadedness upon rising from sitting or lying down); syncope (temporary loss of consciousness and posture, fainting); cardiac arrhythmias; chronic pain; and chronic fatigue. In May 2013 his condition compelled Mr. Mauerman to stop working. Mr. Mauerman's condition has rendered him totally disabled and eligible for benefits according to the terms of the Policy.

4. The Policy provided for payment of LTD benefits for so long as a claimant remained disabled as defined in the Policy. As pertinent here, the Policy required that the claimant be "unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience" in order to be considered disabled.

5. The Policy also provided a "Waiver of Premium" ("Life Waiver of Premium," or "LWOP") benefit applicable to its life insurance coverage. This benefit provided that, if a claimant was "Totally Disabled" as defined, his life insurance coverage would continue without further payment of premiums for so long as he remained Totally Disabled. For purposes of the LWOP benefit the Policy defined "Totally Disabled" as "because of Injury or Sickness, [the claimant] is unable to perform the material and substantial duties of any occupation for which he is or becomes

reasonably qualified for by education, training or experience."

6. The Policy also provided that, with respect to LTD benefits, Sun Life was entitled to have any claimant examined by a physician, other health professional or vocational expert of its choice, as often as reasonably required; with respect to LWOP benefits, it was entitled to designate a physician to examine a claimant when and as often as may be reasonably required.

7. In August 2013 Mr. Mauerman submitted to Sun Life, in accordance with the terms of the Plan and the Policy, a valid and payable claim for LTD and LWOP benefits.

8. Sun Life approved Mr. Mauerman's claim for LTD and LWOP benefits and commenced payment of monthly LTD benefits to him. However, in November 2015, Sun Life improperly and unlawfully terminated payment of LTD benefits to Mr. Mauerman, and improperly and unlawfully discontinued his LWOP benefit as well. The stated reason for the termination of Mr. Mauerman's LTD benefits was that Sun Life had concluded that Mr. Mauerman "would not be precluded from performing the Material and Substantial duties of [his] Own Occupation as a Project Manager which typically exists at a sedentary exertion level and under the terms of the Group Policy qualifies as any Gainful Occupation." The stated basis for the discontinuance of the LWOP benefit was that Sun Life had concluded that "the medical information currently contained in [Mr. Mauerman's] claim file does not provide support for ongoing restrictions and limitations that would preclude [him] performing [his] own occupation as a Project Manager, which is considered sedentary capacity." In each case Sun Life's conclusion was erroneous and rendered on the strength of a report by Calvin P. Fuhrmann, M.D., a physician in Sun Life's employ who had never met nor spoken with Mr. Mauerman. Dr. Fuhrmann's report rejected and overruled the findings and opinions of Mr. Mauerman's long-time team of treating physicians, who had unanimously found him to be unable to perform the duties of any occupation at all. In connection with the termination of his benefits, Sun Life never availed itself of its contractual entitlement to have a physician of its choosing conduct a physical examination of Mr. Mauerman.

9. Sun Life's November 2015 letters terminating, respectively, LTD and LWOP benefits advised Mr. Mauerman that he had a right to "request in writing a review of the denial," in the course of

which he could "submit written comments, documents, records or other information relating to your claim for benefits." The letters provided no further details about the information that was required in order to perfect Mr. Mauerman's claims; for example neither termination letter advised him that Sun Life required that his claim be substantiated with "objective" evidence or documentation from any particular time frame (nor did the Policy impose any such requirements).

10. In December 2015, Mr. Mauerman submitted to Sun Life, in writing, a timely and valid request for review of the termination of his LTD and LWOP benefits. In connection with his request, Mr. Mauerman noted several material factual errors and a "lack of detail" apparent from the face of Sun Life's denial letters. For example, a denial letter quoted Dr. Fuhrmann as stating that Mr. Mauerman had undergone surgery for his tongue cancer and had also had "electronic equipment" implanted to assist in swallowing. In fact, as Mr. Mauerman noted, he had not undergone any surgery for his cancer, which had been treated with chemotherapy and radiation therapy. And he had not had any "electronic equipment" implanted; rather his physicians had implanted an experimental "Swallow Expansion Device (SED) . . . which is purely mechanical." Sun Life also had referenced, again quoting Dr. Fuhrmann, "a history of cardiac arrhythmias for which you have a pacemaker in place"; Mr. Mauerman explained that "I have no pacemaker installed, the arrhythmias are being controlled by medication." In support of his request for review, Mr. Mauerman's spouse and two of his treating physicians also submitted letters to Sun Life:

- Mr. Mauerman's wife, Patricia, submitted a letter in which she described his typical day: he awoke at about 10:30 a.m., after which he had to remain in bed and await improvement and stabilization of his blood pressure and, "when he is able to stand without passing out, he gets himself to the bathroom and urinates by holding himself up by leaning on the bathroom walls"; he took his meals by "inject[ing] his food through the tube permanently implanted in his abdomen for this purpose"; that "if it is a good day, he can stand to perhaps wind the clocks in the house, a passion he had before his cancer, or help me with minor household chores, such as washing dishes or putting a load of clothes in the dryer"; Mr. Mauerman "then watches TV or reads, depending on his cognitive functions for the day, and goes to bed between 8:30 to 9:00 pm each night." Ms. Mauerman also stated "We invite, no urge, your doctor to come to our house to see for themselves what Jeff's health allows him to do. Once you have that information, you will have no choice but to concur with the unanimous opinion of all of Jeff's doctors; there is no job he can realistically fill at this time or in the foreseeable future."
- Mr. Mauerman's otolaryngologist, Peter C. Belafsky, M.D., M.P.H., Ph.D., submitted a

letter in which he stated that "Mr. Mauerman suffers from profound oral, pharyngeal, laryngeal and esophageal dysfunction. He has a dead pharynx, profound trismus, an insensate larynx, and partial paralysis of both of his vocal folds. This results in profound dyspnea, chronic pain, dysphonia, and feeding tube dependent oropharyngeal dysphagia." Dr. Belafsky also stated that Mr. Mauerman's "disability requires around-the-clock tube feeding, complete voice restrictions, and severe limitations with exercise and exertion. There is currently no cure for his disability and all treatments that Mr. Mauerman is currently undergoing are experimental. His disability is permanent with no foreseeable chance of recovery." Dr. Belafsky also invited Sun Life to inquire further: "If you have any questions or concerns regarding the disability assessment of Mr. Jeffrey Mauerman, please do not hesitate to contact me."

- Mr. Mauerman's personal physician, James Trapnell, M.D., explained in a letter to Sun Life that that "[Mr. Mauerman] suffers from a history of cancer of the tongue, and the result and treatment have left him permanently disabled. To be specific, most importantly saving his life, the result of the treatment has lead to a condition called autonomic dysreflexia, which results in having chaotic blood pressure, as well as episodes of syncope from hypotension and weakness. He is also unable to swallow." Dr. Trapnell also explained that Mr. Mauerman "has received an experimental device which is a throat implant that he utilizes when eating to protect his airway from the still frequent respiratory infections he gets from aspiration. For now, he is relegated to using his feeding tube."

11. Following receipt of Mr. Mauerman's request for review, Sun Life never attempted to discuss Mr. Mauerman's case with any of his physicians, including Dr. Belafsky, who had expressly invited Sun Life to do so. Nor did Sun Life ever avail itself of its contractual entitlement to have a physician of its choosing conduct a physical examination of Mr. Mauerman, as Ms. Mauerman had urged. Rather, Sun Life sent the medical records it had at in hand to two more physician consultants: Ross N. Clark, M.D., an otolaryngologist; and Jose A. Perez, Jr., M.D., an internist. In each case, although it had neither requested nor obtained any records contemporaneous with that time period, Sun Life asked the respective consultant to limit his inquiry to "the period of November 2015 to the present." Both physician consultants issued reports of their file reviews that were one-sided, biased, and erroneous; both physicians relied on the absence of records during the time period into which Sun Life had inquired, although Sun Life never attempted to obtain any records from that time period in the first place. For example:

- Dr. Clark referenced Mr. Mauerman's diagnoses of "profound oral, pharyngeal, laryngeal and esophageal dysfunction," "severe dyspnea, chronic pain, dysphonia, and feeding tube dependent oropharyngeal dysphagia," "around-the-clock tube feeding, complete voice restrictions, severe limitations with exercise and exertion," and "hypotension, syncope and weakness,"—and stated "The listed diagnoses are supported." But, he

cavilled, “no other documentation is available for the time period under review [i.e. since November 2015].” Dr. Clark also repeatedly copied-and-pasted the boilerplate observation that “medical documentation does not provide detailed review of his functional abilities and physical examinations for the time period under review.” When it terminated his benefits in November 2015, however—beyond the vague indication that he could submit “written comments, documents, records or other information relating to your claim for benefits”—Sun Life never told Mr. Mauerman that it was requiring “detailed review of his functional abilities and physical examinations” during the precise time frame from and after November 2015 in order to perfect his claim; nor did Sun Life ever attempt to obtain such records. Respecting Mr. Mauerman’s profound fatigue symptoms, Dr. Clark stated “There is no objective evidence to support reported severity of fatigue to the point where the claimant is not able to perform sedentary level of work”; again, however, Sun Life had never advised Mr. Mauerman that “objective evidence” of the severity of his fatigue was required in order to perfect his claim—nor does the symptom of fatigue lend itself to confirmation through “objective evidence” in the first place. Dr. Clark also contended that Mr. Mauerman, whose “complete voice restrictions” were a “supported diagnosis” in his view, had the ability to work full time in an occupation that required “frequent talking,” and that there was “no contraindication to voice use”; never did he explain or otherwise address this patent discrepancy.

- Dr. Perez also averred that, “[f]rom 11/19/15 forward, there is no information to indicate that the claimant was incapable of performing at a sedentary level, including . . . frequent talking,” even as he acknowledged Dr. Belafsky’s letter imposing “complete voice restrictions” on Mr. Mauerman and stated “I would defer to the ENT [Dr. Clark] to determine whether the patient would have a major issue with speech, which could impact the claimant’s ability to work”—and Dr. Clark had opined that “complete voice restrictions” was a “supported diagnosis.” Respecting Mr. Mauerman’s profound fatigue, Dr. Perez stated “There no [sic] documented active disease process that is identified as resulting in significant fatigue.” But the Policy didn’t require a “documented active disease process” as a prerequisite to qualify for benefits. Nor did Sun Life explain to Mr. Mauerman, when it terminated his benefits in November 2015, that he had to identify a “documented active disease process” causing his fatigue, and it never sought to obtain such information from his physicians. Moreover Dr. Belafsky had just submitted to Sun Life a letter that identified “complications suffered as a result of radiation therapy for head and neck cancer” as causing, among other things, “severe limitations with exercise and exertion.”

12. In a February 2016 letter, Sun Life improperly and wrongfully denied Mr. Mauerman’s request for review, offering explanations that did little more than to parrot the reports authored by Drs. Fuhrmann, Clark and Perez. For example, Sun Life uncritically adopted their various assertions regarding the absence of “detailed review of his functional and physical examinations [since November 2015],” despite the facts that (a) Sun Life had never sought to obtain any medical records from that time period; (b) Sun Life had never advised Mr. Mauerman that any such thing was

required to perfect his claim; and (c) had he been so advised Mr. Mauerman would have had the opportunity to obtain such “detailed reviews” and “physical examinations” from his physicians and submit them to Sun Life. Moreover, as a function of ERISA jurisprudence medical records need not be contemporaneous with a period of disability, as required here by Sun Life and its physician consultants, in order to provide evidence supporting a claim for benefits. As another example, Sun Life’s letter uncritically adopted Drs. Clark’s and Perez’s remarks about Mr. Mauerman’s supposed ability to work in an occupation requiring “frequent talking,” despite the “total speech restrictions” imposed by Mr. Mauerman’s physicians and acknowledged by Sun Life’s physician consultants.

13. Mr. Mauerman has exhausted all administrative remedies under the Policy and the Plan, to no avail, inasmuch as Sun Life has persisted in its wrongful conduct.

**First Claim for Relief**
**against Sun Life**
**to recover benefits due under an ERISA plan, and enforce and clarify rights under the Plan, pursuant to 29 USC §1132(a)(1)(B)**
**and**
**attorney fees and costs pursuant to 29 USC §1132(g)**

14. Mr. Mauerman refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this cause of action.

15. As a direct and proximate result of the improper acts and/or omissions herein alleged, Mr. Mauerman has had benefits wrongfully withheld from him under the terms of the Plan and the Policy.

16. As a direct and proximate result of the improper acts and/or omissions herein alleged, Mr. Mauerman has been compelled to incur reasonable attorney fees and other costs associated with the investigation of this claim and the prosecution of this action.

**Second Claim for Relief**
**against Sun Life**
**for breach of trust and breach of fiduciary duty**
**pursuant to 29 USC §§ 1132(a)(2)**
**and**
**attorney fees and costs pursuant to 29 USC §1132(g)**

17. Mr. Mauerman refers to each and every foregoing paragraph of this complaint and incorporates those paragraphs as though set forth in full in this claim for relief.

18. Sun Life was a fiduciary, as defined in 29 USC § 1002(21), with respect to the Plan and the Policy.

19. In its capacity as plan fiduciary, Sun Life owed to Mr. Mauerman certain fiduciary duties, among them that it discharge its duties:

- for the exclusive purposes of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the Plan;
- with the care, skill and diligence under the circumstances that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and
- in accordance with the documents and instruments governing the Plan.

20. Sun Life, in initially terminating and then affirming its own termination of Mr. Mauerman's benefits, engaged in blatantly unfair conduct, in breach of its fiduciary duties and in breach of the terms of the Plan and the Policy. This included conduct that Sun Life has been warned in many judicial decisions, by many different courts, is improper and unlawful; that notwithstanding Sun Life has ignored these binding judicial holdings and persisted in this same improper and unlawful conduct in connection with Mr. Mauerman's claims for benefits. Sun Life treated Mr. Mauerman unfairly, improperly and unlawfully in the following respects among others:

- In *Micha v. Sun Life Assur. Co. of Can.*, 789 F. Supp. 2d 1248 (S.D. Cal. 2011), Sun Life, in its initial denial letter to Micha, had advised that Micha could "submit written comments, documents, records or other information relating to [his] claim for benefits," *id.* at 1254—precisely the same language it used in its initial November 2015 termination letters to Mr. Mauerman. The *Micha* court held that this boilerplate was inadequate and constituted a failure on Sun Life's part to provide "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary," as required by ERISA and its enabling regulations. *Id.* at 1260. Despite the *Micha* court's definitive holding, Sun Life persisted in this unlawful conduct and used exactly the same insufficient and unlawful boilerplate here, offering woefully insufficient guidance to Mr. Mauerman as to what

information was required to perfect his claim.

- The *Micha* court also stated "None of Sun Life's reviewing physicians performed their own physical examinations of Plaintiff; rather, all three limited themselves to 'paper reviews,' examining only the medical records and treatment notes obtained from [treating physicians]. This in and of itself may be indicative of an attempt by an insurance company to avoid paying out on a legitimate claim." *Micha,* 789 F. Supp. 2d at 1258. The *Micha* court also specifically cited in that connection *Salomaa v. Honda Long Term Disability Plan,* 642 F.3d 666, 678 (9th Cir. 2011) where the United States Court of Appeals for the Ninth Circuit criticized the plan's claims administrator because "[t]he medical record by physicians who actually examined Salomaa is entirely one sided in favor of Salomaa's claim. The plan rejected its opportunity to see if there was another side" by failing to conduct an examination of Salomaa and limiting its analysis to a record review. And the Ninth Court also advised Sun Life, in *Evans v. Sun Life & Health Ins. Co.,* 601 F. App'x 497, 498 (9th Cir. 2015), that "its decision to conduct a pure paper review" rather than have the claimant personally examined, among other factors, supported a finding that "Sun Life abused its discretion in denying Evans's long-term disability benefits application." Yet here Sun Life persisted in precisely the same conduct, limiting its analysis to a "pure paper review" and failing to have Mr. Mauerman examined—despite Ms. Mauerman's explicit request that it do so—when his treating physicians unanimously opined that he was unable to work.
- The *Evans* court also criticized Sun Life's "purported reliance on objective evidence when none could be adduced for the particular condition." 601 F. App'x at 498. Similarly, in *Gross v. Sun Life Assur. Co. of Can.,* 734 F.3d 1 (1st Cir. 2013), the United States Court of Appeals for the First Circuit reminded Sun Life that "We have previously found it unreasonable for an insurer to require objective evidence to support a diagnosis of a condition that is not subject to verification through laboratory testing." Despite these judicial decrees, and despite that fact that the Policy in this case imposed no "objective evidence" requirement, Sun Life nonetheless terminated Mr. Mauerman's benefits, and upheld the termination on review, based on an assertion that his symptoms were not established by "objective evidence"—and this as to symptoms such as fatigue, pain and orthostasis that are not amenable to "objective" measurement.

21. As a consequence of Sun Life's breaches of its fiduciary duties and of the terms of the Plan and the Policy, in contravention of judicial holdings in prior cases to which Sun life had itself been a party, Mr. Mauerman is entitled to seek, and seeks hereby, injunctive and other relief, as described below.

WHEREFORE, Mr. Mauerman prays for judgment as follows:

AS TO THE FIRST CLAIM FOR RELIEF:

1. As to LTD benefits, an award of all benefits wrongfully withheld, with pre-judgment and

post-judgment interest thereon, and a clarification of his entitlement to ongoing LTD benefits;

2. As to LWOP benefits, the enforcement of Mr. Mauerman's rights under the terms of the Plan and Policy, and a clarification of his entitlement to ongoing LWOP benefits;

3. An award of attorney fees and costs of suit as authorized by statute;

4. For such other and further relief as the court may deem proper.

AS TO THE SECOND CLAIM FOR RELIEF:

5. Equitable or remedial relief as the Court may deem appropriate, including but not limited to the issuance of an injunction:

- Requiring that Sun Life stop limiting its explanations in its denial letters to boilerplate reciting that a claimant may "submit written comments, documents, records or other information relating to their claim for benefits," and provide in addition thereto an adequate, detailed and understandable description of the additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
- Prohibiting Sun Life from denying or terminating claims for benefits, without affording the claimant an opportunity to be examined by a physician or other appropriate practitioner of Sun Life's choosing, in cases where the claimant's own treating physicians and/or practitioners unanimously opine that the claimant is unable to work; and
- Prohibiting Sun Life from denying or terminating claims based on the absence of "objective" evidence where the condition under consideration is not susceptible to confirmation by "objective" testing or measurement.

6. An award of attorney fees and costs of suit as authorized by statute; and

7. For such other and further relief as the Court may deem proper.

Dated: March 29, 2017

s/Richard Johnston
Richard Johnston
*Attorney for Plaintiff*
*Jeffrey D. Mauerman*